Mr. Sanders. May it please the Court. This is a case of first impression in this circuit, Your Honors, but it may or may not be a case of first impression for the nation. One of the primary questions that we're going to be called upon to answer here is what did the Supreme Court's majority hold in the Aereo decision? That said, I'd like to discuss this on two parallel tracks. One, that the Aereo decision specifically addressed the issue of volitional conduct and thereby overruled the Second, Third, and Fourth Circuits, which had required volitional conduct as an element of copyright claim. And the second being that the majority was silent on the issue, in which case I would say that plaintiff's second argument, that the DMCA was explicitly designed to codify the NETCOM decision and establish a rule set governing copyright and ISPs should govern the outcome of this case. Turning to the first issue as to what happened in Aereo, Justice Scalia in the dissent noted that the Supreme Court had never issued a decision in which it had held that volitional conduct was an element of a copyright claim. The only long-lasting decision consistently cited by plaintiffs is the one in Feist, which simply requires ownership of a right and invasion of one of the 106 rights embedded in a copyright. There was no requirement in Feist for discussion about a third element, which has creeped into the lexicon as volitional conduct or causation element. So if the Supreme Court in the majority in Aereo did not address the issue, then we're left with the only Supreme Court decision discussing the elements of a copyright case, which is Feist. It would be a lot easier, I guess, for all of us if the majority in rendering its decision, instead of just pointing out their differences with the dissent, specifically spoke to the issue of volitional conduct. But they didn't. But what we can learn is from the case history what they did do. They reversed and held Aereo liable in the remand instructions to the lower court for direct copyright infringement. Now, the facts in the case were agreed to in both the district, the circuit, and the Supreme Court. Aereo provided a service whereby it retransmitted over-the-air television signals to users. The system itself was inert. It didn't do anything until a user triggered it and turned the knob and said, I would like to watch this show. But it made those shows available. It did. And analogous to this situation, the defendant in this case made the images that the plaintiff owns available to anyone who chose to log into their website. Well, the person who posted them did. Well, the defendant is providing the equipment. This is analogous to Aereo's argument. Aereo says, we just merely provide the equipment here. They're not providing a warehouse full of photographs. He's just providing the equipment. Well, it's providing a website wherein users can store content that they could use that content to create website traffic and thereby sell advertising space to make a profit. So they are providing, analogous to Aereo, the equipment, the resources for this activity to have transpired. That's your position. Yes. If the majority had agreed with Justice Scalia in the dissent, the outcome would have been different. So what we can learn from the majority's silence is still that they didn't feel that the volitional conduct was an element of a direct copyright infringement case. However, as I indicated earlier, in the event that Aereo didn't render that decision, then we're back to where we started, which is, did the DMCA's passage explicitly codify the Netcom decision and set forth the rule set that governs this exact conduct? And I just would like to read briefly the House Rapid Report, which was the preamble to the passage of the bill. It says, Title II of this bill codifies the core of current case law, Netcom, dealing with the liability of online service providers while narrowing and clarifying the law in other respects. And what we see here is that Congress was trying to provide a mechanism for the free distribution of content. But by the same token, we didn't want to undermine the rights afforded under the U.S. Constitution for copyright. So they set forth a legislated schema that required, in order for you to claim the Netcom volitional conduct offense, that you register with the U.S. Copyright Office, the designated agent for takedown notices. It's clear that that did not occur and that the defendant herein did not register. But they would like to claim the benefits of the safe harbor without being beholden to the requirements of the safe harbor. And the safe harbor requirements are that they have a repeat infringer policy, that they enforce and post and publish, that they register with the U.S. Copyright Office, the designated agent to be served with copyright takedown notices. So here we have a situation where the defendant is claiming the benefit, the safe harbor of Netcom, codified into the DMCA, but also saying that they're not responsible for the other side of the balance, that being their requirement to register and to takedown materials and to provide a repeat infringer policy. Of course, the other side mentions the caveat that you're familiar as failure to qualify if that limitation doesn't affect any other defense, that basically they're not infringing. So it seems to me that puts us back to where we would be or actually where your friend on the other side would be. If without the safe harbor at all, we still have to figure out whether Netcom and case law like that ought to be applicable. Areas where the AO, it seems to me, doesn't really answer that question either. It avoids it, not the dissent, but it doesn't rule on it. The majority doesn't. So it seems to me we have sort of a big picture question here. Even though this is foreign language to copyright law, there's something, we can pick other words, but there's something like volition and causation actually properly apply as the technology is changing, some of the understandings are changing, maybe a new statute would be helpful, but we are where we are. So sort of deal with that whole concept of volition. Why isn't that the right way to look at it, even if we use a different word? Well, Your Honors, when we talk about volition and we talk about copyright, we're not just talking about the conduct of ISPs. There are plenty of other mediums where that conversation may or may not be more relevant. But when we're talking about an ISP, an Internet Service Provider, the balance in the discussion reached the floor of Congress. They recognized the issues that were being discussed in Netcom and decided to establish a system for governing it. So while volitional conduct may be an element in a non-ISP oriented copyright claim, it's covered by the DMCA. We'll have to resolve that, I suppose. Agreed, Your Honor. Now, up until two weeks ago, this seemed to be a new issue, but the Ninth Circuit has weighed in and I think it's worthwhile trying to see if we could figure out how their discussion affects this morning's proceeding. The Ninth Circuit in Perfect Ten Giga News, which was a case provided by defense counsel to the Court last week, discusses Aereo and discusses the volitional conduct and, at least in the Ninth Circuit, establishes firmly that they believe that volitional conduct is an element of a direct copyright claim. But the dance that they do to get there is quite miraculous, because they read the majority decision, they look at the holding which reversed Aereo's victories in both the District and Circuit Courts, and the clear factual underpinnings that there was no volitional conduct, that the user was the one who tuned in the station. And yet, they reached an inopposite conclusion, that volitional conduct wasn't upset by the Aereo decision. I think that it has to be looked at as anomalous to what the Supreme Court's intentions were in Aereo, and inconsistent with that decision. And were this Court to rule inopposite, it would most likely result in the Supreme Court being asked to weigh in on what did they actually decide in their 6-3 decision in Aereo. But I don't think it is relevant to what this Court should be looking at. I think that if, as I said earlier, if Aereo didn't address the issue, then we're back to the discussion of whether or not the DMCA did. And I don't see how you could read in a volitional element which was created in its inception by Netcom and its progeny, which was discussed entirely by the Senate and House prior to the passage of the DMCA, and ignore that. It was clearly designed to expressly codify what Netcom had created vis-à-vis common law. That's the title. That's what its intention was. But it came with a balance. It didn't come with a just I didn't do it defense. You needed to take affirmative action. You needed to register. You needed to provide the rights holder with a mechanism to complain that even if you were just passively providing the content to your users, that there would be a mechanism to force its take down, and that there would be penalties for failing to take it down. And if we don't look at it from that point of view, then it serves no purpose. You'd be better served not registering under the DMCA. The common law was providing the same or similar safe harbor with no requirements. And I don't see how it could be looked at any other way than that. Now, DMCA is only there to address ISPs. It wasn't designed to discuss or look at other forms of copyright and other media. And it wasn't designed to be the only defense to a copyright claim. So fair use is still around, authorized use, licensure. The DMCA's exclusion in its text that it doesn't intend to overrule other copyright defenses, those would be the examples of what other defenses it wasn't intended to overrule. But what it was intended to do was to explain how NETCOM would be handled consistently across the entire nation. At the time, NETCOM was a Northern District of California case. It hadn't yet reached the circuit courts. This was a result of a push by the industry for uniformity. Instead of waiting for the hodgepodge of results that would have come from different district courts and then cases moving up to the circuits and maybe the Supreme Court, Congress stepped in and addressed the issue and set up a uniform schema for everyone. So in closing, it's our position that the aerial majority, through its holding, expressly rejected the dissent's argument that volitional conduct was an element of copyright infringement. And maintaining their consistent case law up until that point, that there were only two elements of copyright infringement, two elements necessary to prove a direct infringement case, ownership of the right and a violation of the 106 rights exclusive to the rights holder. Thank you. Thank you. And you've saved time for rebuttal, Mr. Sanders. Mr. Cleveland. Thank you, Your Honor. May it please the Court. Joe Cleveland representing TNS Software. This case requires this Court to answer two simple but very important questions. Who made the copies and who displayed the copies of those images? In both cases, the undisputed evidence establishes that the end user made the copies and displayed these images on my client's website. TNS simply provided the system to access those copies by third parties. The evidence also establishes that TNS only passively stores material at the direction of users in order to make the material available to other third parties. Mr. Sanders says that you're asking for the benefit of the safe harbor provision without registry. What's your take on that? Well, I don't want to register an agent with the Copyright Office. But as Judge Southwick pointed out, there is a caveat in the DMCA that specifically provides for the party to assert a defense that's ordinarily maintained in the copyright case law and in the statute. And that defense is causation. And that's a long, long, long, long, long settled rule of law in not only in this context, in the Copyright Act context, but all strict liability contexts. I'd like to point out a concurring opinion by Justice O'Connor in a different context, but involving a strict liability statute much like the Copyright Act. It's called Babbitt v. Sweet Home. It's at 515 U.S. at 712. And she said, I see no intersection intended to dispense with the ordinary principle's approximate cause. Strict liability means liability without regard to fault. It does not normally mean liability for every consequence, however remote, of one's conduct. And she concluded by saying, I would not lightly assume that Congress, in enacting a strict liability statute that is silent on causation question, has dispensed with this well-entrenched principle. And Babbitt v. Universal Studios, this is a 1984 United States Supreme Court case. The court said that, quote, the Copyright Act does not expressly render anyone liable for infringement committed by another, and strongly signaled its intent to use the doctrine of contributory infringement to identify circumstances where it is just to hold someone accountable for infringement. Third-party conduct would be wholly irrelevant in an action for direct infringement. And that's the case at 464 U.S. at 446. And in this case, TNS is, again, simply a passive provider of a system used by third parties. TNS did not exercise any control over the copyrighted content. It did not select any material, copyrighted material for upload, download, transmission, or storage. And it did not instigate any copying or storage or distribution of the copyrighted work. Therefore, TNS's conduct is not the proximate cause of the infringement. And every court of appeals to have considered an ISP, Internet Service Providers, direct liability for copyright infringement, has adopted the rule that a defendant ISP may be held directly liable for copyright infringement if the defendant is engaged in volitional conduct that causes an infringement of a copyrighted work. But, counsel, why in Aereo was that provider any more the proximate cause than you are? Well, in Aereo — excuse me, Your Honor. In Aereo, the court's decision really settled on this lookalike CATV issue. And — Certainly, what Justice Scalia said, there are several rules of copyright law, and one is if you look like CATV. But isn't the same factual, basic premise there, that they have these little tiny antennas and it's up to the people who are purchasing through Aereo's system to decide which ones to choose? But it's all sitting there. The library isn't maintained by Aereo. Any more than the library of photos was — of what's going to be put on your site was maintained by your company. So are you sort of saying that Aereo is not particularly helpful in us deciding how causation works? That's correct, Your Honor. I don't think it's particularly helpful because it skirts the issue. It did not address the issue. It decided the issue — it decided that case on alternative grounds, and that was the lookalike CATV grounds. And so it did not directly address the issue. In fact, the — it did not directly dispute or even comment on Justice Scalia's volitional conduct requirement. There was no mention of it — of the volitional conduct requirement for or against in the majority's opinion. Does the majority — I should know this — refer to causation and say we're not — we're not — Justice Scalia mentions it, briefing mentions it, we don't find it necessary to discuss it? No, there's no discussion of causation in that opinion because, like I said, they decided on the alternative grounds. No, what I was saying is do they identify it as a point of potential interest, but we don't have to reach it? The only thing that we can see in the tea leaves is this quote out of the case. And in the Court's opinion, the Court said, quote, in other cases involving other technologies, a user's involvement in the operation of the provider's equipment and selection of the content may well bear on whether a provider performs within the meaning of the act. And so they left open this idea, as Justice O'Connor said, this well-entrenched principle of proximate causation to apply in strict liability statutes like the Copyright Act. I'd also want to address the DMCA argument that Counsel Opposite suggested that we focus on here today, and that even though the DMCA was designed to provide ISPs with a safe harbor if they registered, there's nothing in the language of Section 512 of the Copyright Act that indicates limitation of liability described in Section 512 is exclusive. And as Judge Southwick pointed out, there is a particular provision in the Section 512 that allows for other defenses to be asserted in addition to the immunity defense under Section 512. Also, there's no explicit congressional intent to supplant existing common law. There's nothing in the act to suggest that they intended to take over the field of existing common law in the copyright arena. And in the legislative history, the Congress expressly intended that the courts continue to develop and determine how to apply the copyright law to the Internet. And as the COSTAR Four Circuit decision indicated, the DMCA is a floor, not a ceiling, of protection in the copyright arena. So I think the current state of law is that if an ISP qualifies and registers an agent with the Copyright Office, they're entitled to this qualified immunity. But if they don't, they're still entitled to the defenses that are ordinarily allowed under the current existing copyright law. So that's the current scheme that we're operating under at this time. So, Counsel, one of the responses your colleague on the other side might have to that is this House report preface that he was reading, that they were aware of NETCOM, and they were trying to adjust the copyright law in response to this new reality. If you want us to use causation or volitional conduct, it would be a pretty good time for Congress to put something in the copyright law that would help us go that direction. What is in the amendment, other than safe harbor, that would reflect that they were responding to NETCOM? Well, I think that the law is that if the Congress intends to uproot some principle in the common law, that there has to be some explicit indication by Congress in the legislation that they intended to do that. And that's what's pointed out by Costar in the Fourth Circuit. He said there is no express intent by Congress to supplant existing common law on copyright infringement, requiring that there be some causation between the infringer and some link to the infringing conduct. That's understood, and it may be a complete answer, but it just concerns me that if Congress was aware of that case law, which has become a very popular case law to be discussing, that there wasn't anything in the amendments that really dealt with it. And what you're just telling me, they dealt with it by not changing the common law without — because they don't have explicit language. And that may be a sufficient answer, but it does seem to be a fairly weak response by Congress. Well, I think they addressed it by the — by adding that caveat, as you called it, in Section 512L, which talks about that this does not supplant the requirement that a plaintiff in a copyright case prove the prima facie elements of a copyright infringement or any other defenses. So I think that that evidences legislative intent that the causation that was developed in the lower courts, the requirement of causation, was not intended to be supplanted. And I think if you say, well, the DMCA intended to supplant causation and wipe it out entirely, I mean, what's going to connect the conduct to the infringement? There has to be — the jury has to know what — in a jury instruction, you know, there has to be something that connects the conduct. It can't — the conduct can't just be isolated on its own and not be connected to the infringement. And so I think the jury has got to know what the causation element is and what causation means. Unless there are any other questions, I would like to conclude. Thank you, Mr. Cleveland. Thank you. Sanders, you've saved time for a vote. I just have a couple of additional points that I'd like to make in responding to Your Honor's question. I turn to the House report which accompanied the DMCA passage, and I'll read, as to direct infringement, liability is ruled out for passive automatic acts engaged in through a technological process initiated by another. Thus, the bill essentially codifies the result in the leading and most thoughtful judicial decision to date, Religious Technology Center v. Netcom. That, combined with the rest of the bill's discussion about bringing copyright into the digital age and recognizing that a user might upload content to a passive ISP, was the genesis of the DMCA. It was the reason it was passed. It was the reason it was passed to address this exact issue that's before this Court. And because of its passage, in order to bring forth the safe harbor, you need to comply with its requirements. Otherwise, there would have been no need to have passed it. They could have just let Netcom grow. There could have been differences in how it evolved in the different circuits and the different courts. And then the other side of that is, if they're trying to codify, and again, legislative history is very suspect. Who wrote that and what were they trying to achieve? But to the extent it is a fair reflection of what the amendments are supposed to do, if they are codifying what Netcom did, then we should look upon that as incorporating the concepts. And safe harbor is one thing, but it leaves in place, whether it's called causation, whether volition is a better way to look at it, or something else, it leaves those in place as well to be dealt with. I don't know if it's capital letters caveat, but we've been calling it the caveat, to be dealt with under that part of the statute, that if you don't name an agent and whatever else is required, you at least are subject to the kinds of defenses you would have under Netcom. Right. I think we have to look at the evolution that led to the Netcom decision in 1990. What was it, one or two? We have the DMCA passage. I'm sorry, Netcom was 95. We had the DMCA passage in 98. This is at the very beginning of the Internet. This is at the beginning of a new medium for the display, copy, and communication of copyrighted materials. There was a period that preceded this where it was much simpler, where we didn't have a user interaction as part of the process, and we had a strict liability statute or application of the law by the Supreme Court, as I said, under FICE, with only two requisite elements. So what we have is an evolution, and we have a timeline, and it's somewhat difficult because of where we stand today and how integrated the Internet is into our daily lives, to look back and understand what was happening. But by its title, the bill was intended to bring the Copyright Act to the next millennium. This is the next millennium. Thank you. Thank you, Mr. Chairman.